

U.S. FILED
EASTERN DISTRICT COURT
DISTRICT OF LA
2005 NOV -7 AM 11: 45
LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

DONNA DUPUY                                    CIVIL ACTION

VERSUS                                         NO. 05-315

JO ANNE B. BARNHART,                           SECTION "K" (2)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION


## FINDINGS AND RECOMMENDATION

Plaintiff, Donna Dupuy, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") under Title II, of the Act.  42 U.S.C. §§ 405(g), 423.  This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

As ordered, plaintiff filed a memorandum of facts and law.  Record Doc. No. 10. One of plaintiff's points of error was that certain medical records were missing from the

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No _____

official record.  Defendant received leave to file a supplemental transcript that included

the missing records, Record Doc. Nos. 13-15, so that point of error is moot.  Defendant

filed a timely reply memorandum of facts and law.  Record Doc. No. 16.

I.      PROCEDURAL HISTORY

Dupuy filed her application for DIB on March 20, 2002, alleging disability since

November 1, 1999 based on anxiety, depression and sleep disorder.  (Tr. 56).  However,

the ALJ found, and Dupuy confirmed in her testimony, that she continued to work in

substantial gainful activity through January 31, 2001.  Accordingly, plaintiff does not

dispute the amended disability onset date of January 31, 2001.

After her application was denied, Dupuy requested a hearing before an ALJ,

which was held on November 8, 2002.  On June 10, 2003, the ALJ denied plaintiff's

application.  (Tr. 18-35).  After the Appeals Council denied review on December 10,

2004 (Tr. 5-7), the ALJ's decision became the final decision of the Commissioner for

purposes of this court's review.

II.     STATEMENT OF THE ISSUE ON APPEAL

Plaintiff contends that the ALJ made the following error:

A.      The ALJ failed to weigh properly the opinions of plaintiff's treating
        psychiatrists and the non-examining program psychologist concerning
        plaintiff's mental residual functional capacity and the ALJ failed to include
        a function by function assessment of Dupuy's work-related limitations.

2

III.    ALJ'S FINDINGS RELEVANT TO ISSUE ON APPEAL

The ALJ made the following relevant findings:

1. Dupuy has major depression, an anxiety disorder, cervical spondylosis with cervical stenosis and degenerative disc disease of the lumbar spine. She is status post anterior cervical discectomy and fusion and she abuses alcohol. These are severe impairments.

2. Her impairments do not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4, including but not limited to Listing 12.04 for affective disorders.

3. Plaintiff's allegations regarding her limitations are not totally credible.

4. Dupuy has the residual functional capacity to lift and carry 10 pounds occasionally and less than 10 pounds frequently. She can stand and walk 2 hours out of 8 and sit 6 hours out of 8, with the option of alternating every 30 minutes between sitting and standing. She can push and pull as limited by her ability to lift and carry. She can have only limited contact with the public and she is capable of performing only low-stress work that does not entail great responsibility.

5. Plaintiff has the residual functional capacity to perform a significant range of sedentary work but is unable to perform her past relevant work.

6. There are a significant number of jobs in the national economy that the claimant could perform, including the 11 types of jobs listed in the ALJ's opinion.

(Tr. 23, 33-34).

3

IV.    ANALYSIS

    A.    Standards of Review

    The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 389 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Loza, 219 F.3d at 393; Spellman, 1 F.3d at 360. This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). The Commissioner, rather than the courts, must resolve conflicts in the evidence. Id.

    The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91 (1992). Despite this court's limited function, it must scrutinize the record

4

in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1022 (5th Cir. 1990); <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. <u>Newton</u>, 209 F.3d at 452; <u>Martinez v. Chater</u>, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for DIB, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2002). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. <u>Id.</u> §§ 404.1520, 416.920; <u>Waters</u>, 276 F.3d at 716; <u>Loza</u>, 219 F.3d at 393.[1] The five-step

---

[1]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. <u>Id.</u> §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period

inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry. Newton, 209 F.3d at 453.  If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing.  When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Id.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions

---

of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

6

of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." Martinez, 64 F.3d at 174.

B.    Factual Background

Plaintiff testified that she was 49 years old on the date of the hearing and had completed two years of college in accounting. (Tr. 268). She conceded that, although she had alleged a disability onset date of November 1, 1999, she had actually worked until January 31, 2001, after her doctor had ordered her to stop working in December 2000. (Tr. 268-72). She stated that she began receiving $2,750 per month in benefits from her disability insurance policy on March 1, 2001, and that her benefits under that policy would end in February 2003. (Tr. 270). She said that she had been the CEO and treasurer of a federal credit union since 1984. (Tr. 272).

Dupuy testified that she takes prescription drugs prescribed by four doctors. She said she takes Celebrex for arthritis, Ambien for sleep disorder, carisoprodol (generic version of Soma)[2] prescribed by neurosurgeon Dr. John Schumacher for muscle spasms,

---

[2]The generic version of Soma, which "is used, along with rest, physical therapy, and other measures, for the relief of acute, painful muscle strains and spasms." Physicians Drug Reference, available online at http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/som1409.shtml.

clorazepate[3] for panic disorder and Depakote[4] for panic and depression. She stated that she saw psychiatrist Dr. Carol Bayer for two years and then switched to psychiatrist Dr. Roger Anastasio in July 2002, who began prescribing Depakote for her. (Tr. 273). Plaintiff said that the dosage of Depakote was based on her weight and could not be increased, her dosages of Depakote and clorazepate had been unchanged since she began taking them and Dr. Anastasio had not prescribed anything weaker initially. She stated that she usually breaks her muscle relaxant pill in half and takes one-half pill every four hours instead of one every eight hours, because a whole one makes her too sleepy. (Tr. 274). She testified that she does not take the muscle relaxant every day but only when she has muscle spasms. She said she takes Ambien every night.

Plaintiff stated that she was using up the remaining Ambien that had been prescribed by Dr. Bayer. She said Dr. Anastasio told her that he would prescribe a different sleep medication after she used up the Ambien. Dupuy testified that Dr. Qureshi had prescribed a year's worth of Celebrex for her after she was in a motor

---

[3]The generic version of Tranxene, which "belongs to a class of drugs known as benzodiazepines. It is used in the treatment of anxiety disorders and for short-term relief of the symptoms of anxiety." Id. at http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/tra1454.shtml.

[4]"Depakote, in both delayed-release tablet and capsule form, is used to treat certain types of seizures and convulsions. It may be prescribed alone or with other epilepsy medications. The delayed-release tablets are also used to control the manic episodes--periods of abnormally high spirits and energy--that occur in bipolar disorder (manic depression)." Id. at http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/dep1125.shtml

vehicle accident on February 14, 2002, when another driver ran a stop sign and hit her vehicle, which caused all her neck and spinal problems. (Tr. 275). She stated that her gynecologist, Dr. Paul Fuselier, had run a bone density scan and found that she was in the middle stage of osteoporosis. She said Dr. Fusilier told her that Celebrex would help with that and that he would prescribe something else for osteoporosis when she ran out of Celebrex. (Tr. 275-76). She said she had no side effects from her medications.

Dupuy testified that her doctor ordered her to stop working because her weight had decreased to 96 pounds, she was not eating and she was not sleeping. She said she had not taken any legal action against her former employer or the federal agency (the NCUA) that audited the credit union because she does not yet feel mentally strong enough to take that action. She said that the NCUA had audited the credit union in 1999, that it was not an ordinary audit and that a former examiner from the NCUA had taken her job. (Tr. 276). She stated that friends of the former examiner had performed the audit. Plaintiff testified that she had not yet spoken to an attorney about the situation because she did not feel strong enough to relive it, but that she intended to do so. She said she would pursue it only if she did not have to go to court because she did not feel strong enough to do that.

9

Dupuy stated that she had neck surgery as a result of the automobile accident on February 14, 2002. She said her spine was being crushed and the doctor had to remove five or six vertebrae, replace the bone, put in a plate and fuse it. She said she had hired an attorney concerning the accident. (Tr. 277).

Plaintiff testified that she continued to see Dr. Bayer into June 2002, although the medical records from Dr. Bayer in the record ended in April 2002. She said she began seeing Dr. Anastasio in July 2002, although the only records from him in the record were dated September 25 and October 23, 2002. (Tr. 278).

Dupuy testified that she no longer has a problem with drinking. She stated that she had stopped drinking because she was taking so much medication. She said that she was in a bad state the day before she found out that she had to have surgery on her neck and she drank two glasses of wine when she went out to lunch that day, then saw Dr. Bayer in the afternoon. She testified that Dr. Bayer was upset with her and that was when the issue of her drinking first came up. She said Dr. Bayer suggested that she go to Alcoholics Anonymous. Plaintiff stated that, before that incident, her doctor had only recommended that she go to Al-Anon because she had family members who have problems with alcohol. Dupuy said that she now goes to Alcoholics Anonymous meetings with her brother, who is bipolar and a recovering alcoholic and does not drink,

10

but that she goes only as an observer, not a participant.  She stated that she still drinks a couple of glasses of wine once or twice a week, with a meal.

Plaintiff testified that she cannot work because she gets panic attacks that sometimes prevent her from leaving the house.  She said she will get dressed but then will be unable to go.  She stated that she no longer trusts people.  (Tr. 279).  She also said that she has trouble concentrating, has to read things over and over, has to use a calculator and has to study the calculations when she used to be able to do the math in her head.  (Tr. 279-80).

Dupuy stated that she does not think that she can sit or stand or stay in one position for very long.  She explained that she paces a lot and has to walk around because of problems with her lower back.  She said her doctor has told her that he will not do anything with her lower back right now but that she may need surgery eventually. Plaintiff said she can sit sometimes only for 20 minutes before she has to walk around and that she can walk for 20 to 30 minutes if it is just to relieve her back pain.  However, she testified that, if she paces because she is in a panic, she could walk around for 60 to 90 minutes.  She stated that she has a hard time communicating, talking or socializing with people and that she does not socialize any more.  (Tr. 280).

11

Plaintiff testified that Dr. Anastasio is not sure whether her panic attacks can be controlled better. She said that bipolar disorder runs in her family. She stated that Dr. Anastasio believes that some of her symptoms may be symptoms of bipolar disorder. She said the medication she takes for panic attacks has helped decrease her pacing but has not decreased the number of panic attacks. She described her symptoms as an inability to breathe, then she starts pacing or cleaning excessively. She said she has panic attacks daily and does not know what triggers them. (Tr. 281). Dupuy stated that her panic attacks last from 20 to 60 minutes and that breathing, pacing and cleaning make her feel better. She said her doctor has not given her any hope that medication will stop the attacks.

Plaintiff said that therapy helped her initially because she had to work through her hurt feelings and anger. But she said she felt that, by the second year, there was nothing more to say and nothing had changed. (Tr. 282). She testified that she feels more comfortable with her new doctor, whom she sees once a month for therapy and medication. (Tr. 282-83).

Dupuy stated that she can take care of her personal needs, including hygiene, cooking and cleaning. She said she sometimes gets tremors and cannot set her hair or do her nails, so a friend comes to her house and does those things for her. She testified

that she drives, but only within five miles of her house. She stated that she drives only to pick up her brother, to go to the clinic, to see a doctor or an attorney and to go to the grocery store or to Big Lots for cleaning products. She said she picks up her brother and takes him to AA meetings because he cannot drive. (Tr. 283).

Plaintiff testified that she has a sister and a nephew in California who keep calling her for money, but they do not visit her. She said she has a friend who calls or comes to her house to visit once a week. She stated that she had recently gone out to lunch at Drago's Restaurant with her brother, at a time when the restaurant was not crowded, and that she ate charbroiled oysters and visited with the owner and his family at the restaurant for about 40 minutes. She said she felt that she could not stay any longer. (Tr. 284).

Dupuy testified that she had no children. She stated that she only sleeps about three to four hours per night and that, when she awakens, she gets up and tries to read for a while, then just sits for a while and eventually lies down again. (Tr. 285). She testified that she lies down in a vibrating recliner for three to four hours during the day, which helps her back. (Tr. 285-86).

In response to the ALJ's questioning about any manic phase related to Dr. Anastasio's recent diagnosis of bipolar disorder, Dupuy testified that, when she is pacing or cleaning, she is "racing like I'm going 100 miles an hour" and she feels that she must

13

get it done immediately and quickly.  She said she usually has to lie down after the panic

attack subsides because she feels completely drained.  (Tr. 294).

C.      Vocational Expert Testimony

A vocational expert, Kelly Roberts, testified that plaintiff's prior work as a

financial institution treasurer and CEO was sedentary and highly skilled and that her

skills are transferable to other sedentary jobs.  (Tr. 287-88).  The ALJ proposed a

hypothetical of a person who can perform sedentary work with little contact with the

public, low stress or low responsibility, and the ability to alternate sitting and standing

every 30 minutes.

Roberts testified that such a claimant could not perform Dupuy's past relevant

work but could perform other jobs that are available in significant numbers in the state

and national economies.  She stated that such sedentary, semiskilled jobs include

accounting and auditing clerk, billing clerk, posting and calculating clerk, and cost and

rate clerk. (Tr. 288-89).  Roberts testified that she would reduce the number of available

jobs by 30 percent to account for the low stress and little contact with the public

requirements of the hypothetical.

The ALJ posed a second hypothetical with the added requirement that the job must

entail simple instructions only.  The vocational expert testified that significant numbers

14

of available jobs exist with those limitations, including records clerk, posting and calculating clerk, and cost and rate clerk. She said she would again reduce the numbers by 30 percent. (Tr. 290).

Roberts stated that additional jobs would be available under this hypothetical in the sedentary, unskilled category, such as cashier, with a 70 percent reduction in available numbers, and dispatcher and assembler, each with a 30 percent reduction.

On cross-examination, plaintiff's attorney posed an additional restriction to the second hypothetical of a moderate impairment in the claimant's ability to maintain concentration, persistence and pace. The vocational expert stated that the number of available jobs would probably be reduced by an additional 25 percent. (Tr. 291).

Plaintiff's attorney then added another restriction of a moderate impairment in the claimant's ability to follow work rules, function independently, maintain attention and concentration and follow detailed or simple job instructions. Roberts testified that this additional restriction would preclude the finance-related jobs she had previously listed because those jobs require more attention to detail, leaving only dispatcher, assembler and cashier as available jobs. (Tr. 292).

15

Finally, plaintiff's attorney added a restriction of no useful ability to deal with the public, interact with supervisors or deal with work stresses. The vocational expert stated that this combination of restrictions would preclude all work. (Tr. 293).

D.   Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence. (Tr. 23-31). I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections, and highlights noted below.

E.   Plaintiff's Appeal

The ALJ found that Dupuy has severe impairments consisting of major depression, anxiety disorder, cervical spondylosis with cervical stenosis and degenerative disc disease of the lumbar spine, and that she is status post anterior cervical discectomy and fusion and she abuses alcohol. At the fifth step of the sequential evaluation, the ALJ found that plaintiff is not disabled because she retains the residual functional capacity to perform a significant range of sedentary work with the restrictions noted in the opinion, including that she have only limited contact with the public and perform only low-stress work that does not entail great responsibility.

16

Dupuy argues that the ALJ failed to weigh properly the opinions of plaintiff's treating psychiatrists and the non-examining program psychologist concerning plaintiff's mental residual functional capacity and that the ALJ failed to include a function by function assessment of Dupuy's work-related limitations.

The ALJ declined to accord controlling weight to the opinions of Dr. Anastasio. Although Dr. Anastasio saw Dupuy only three times before the ALJ rendered her decision, the ALJ accepted Dr. Anastasio as a treating source. However, the ALJ refused to accept the limitations expressed by Dr. Anastasio on a form "Medical Assessment of Ability to Do Work-Related Activities (Mental)" dated November 6, 2002, two days before the hearing. On that form, Dr. Anastasio checked off boxes indicating that Dupuy is seriously limited or has no useful ability to function in every area of making occupational adjustments, making performance adjustments and making personal-social adjustments (except in her ability to maintain personal appearance). Dr. Anastasio commented that plaintiff is easily agitated and overwhelmed by perceived stressors, has little to no tolerance for frustration and has difficulty with memory and thought blocking. (Tr. 260C-260E).

The ALJ did not accord controlling weight to Dr. Anastasio's opinions on this form concerning plaintiff's limitations because the opinions were inconsistent with other

17

medical evidence of record. The ALJ accurately summarized the conflicting evidence from Dr. Anastasio's own treatment notes (including his GAF score assessment of 55, which indicates that Dupuy was currently experiencing and had experienced during the past year only moderate symptoms)[5] (Tr. 260F-260J), the medical records of plaintiff's long-term treating psychiatrist, Dr. Bayer (Tr. 96-109), and the assessment of consulting psychologist, Lawrence Guidry, Ph.D. (Tr. 148-65), which was based on a review of the medical records through April 30, 2002.

Dupuy contends that the ALJ erred because she did not accord considerable weight to the opinion of Dr. Anastasio, who is familiar with her impairments, treatments and responses. However, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight [only] if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." Newton, 209 F.3d at 455 (emphasis added).

> The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. The treating physician's opinions are not conclusive. The opinions may be assigned little or no weight when good cause is shown. Good cause may permit an ALJ to discount the weight of

---

[5]"The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.' A GAF score of 51-60 indicates 'moderate symptoms,' such as a flat affect, or 'moderate difficulty in social or occupational functioning.'" Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000)).

> a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, <u>or is otherwise unsupported by the evidence</u>.

<u>Id.</u> at 455-56 (emphasis added).

The ALJ in the instant case was entitled to give no weight to Dr. Anastasio's opinion that Dupuy was so seriously limited by her mental impairments that she could not perform any work activities, given the substantial evidence to the contrary in the record and the inconsistencies in Dr. Anastasio's own assessments of the severity of plaintiff's mental impairments. The ALJ determined that Dr. Anastasio's opinions on the November 6, 2002 form were against the weight of the objective medical evidence, which indicated that Dupuy's limitations were not so severe. Specifically, Dr. Anastasio's own treatment records, the assessment by Dr. Guidry and the treatment records of Dr. Bayer (all of which are adequately summarized in the ALJ's opinion), are consistent with each other that plaintiff suffered only moderate symptoms and limitations, and are substantial evidence that support the ALJ's decision not to accord controlling weight to Dr. Anastasio's conflicting opinions on the medical assessment form. The ALJ adequately explained her reasons for rejecting Dr. Anastasio's severity opinion in the face of substantial conflicting evidence.

In addition, contrary to plaintiff's argument, the ALJ considered plaintiff's mental and physical limitations in combination when she assessed plaintiff's residual functional capacity. The ALJ accurately summarized the medical records concerning Dupuy's physical impairments (Tr. 29) and incorporated both physical and mental limitations in her residual functional capacity opinion. The ALJ specifically noted that her residual functional capacity opinion incorporated plaintiff's need to alternate sitting and standing, and it also included limitations on her contact with the public and with stress and responsibility levels to accommodate her mental impairments.

Thus, substantial evidence supports the ALJ's finding that Dupuy can perform sedentary work with the limitations listed in her opinion.

## CONCLUSION

Substantial evidence in the record supports the weight accorded to the various medical opinions and the ALJ's findings concerning plaintiff's residual functional capacity.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this _7th_ day of November, 2005.


JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE